Weaver, J.
(concurring in result only). I concur in only the result of the majority opinion. I would hold that plaintiffs have standing under MCL 324.1701(1) of the Michigan environmental protection act (MEPA) to bring an action to enjoin mining activities that plaintiffs allege will irreparably harm natural resources.
I dissent from the majority’s analysis of “standing” and “judicial power” because this analysis utterly ignores the will of the people of Michigan expressed in art 4, § 52 of our Constitution that
[t]he conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction.[1]
Pursuant to this constitutional provision, the people of Michigan have required that the Legislature provide for the protection of Michigan’s natural resources. The Legislature properly acted in fulfillment of its constitu *652 tional responsibility[2] through enactment of MEPA’s citizen-suit provision that provides:
The attorney general or any person may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction. [MCL 324.1701(l)(emphasis added).]
The majority disregards the intent of the Legislature, erodes the people’s constitutional mandate, and overrules 30 years of Michigan case law that held that the Legislature meant what it said when it allowed “any person” to bring an action in circuit court to protect natural resources from actual or likely harm.[3]
In this case, this Court specifically asked the question whether the Legislature may confer standing under MCL 324.1701(1) of MEPA on persons who do not satisfy the judicial test for standing articulated by Lee v Macomb Co Bd of Comm’rs, 464 Mich 726; 629 NW2d 900 (2001). The majority purports to not decide this *653 question, but it clearly implies that the Legislature’s attempt to confer standing more broadly than Lee in MEPA or any other statute is unconstitutional.
Fortunately for the plaintiffs in this case the majority concludes that the plaintiffs have standing under the judge-made test articulated in Lee.[4] In so holding, the majority purports to exercise judicial restraint, asserting that it is preserving the “separation of powers” by not exercising the “power” conferred upon it by the Legislature under MEPA and applying Lee’s restrictive standing test to these MEPA plaintiffs. This assertion is untrue because MEPA empowered the people to help protect the state’s natural resources, not the courts, and because the majority has in fact laid out its position on the constitutional question. Though camouflaged by the correct result, it is clear that the majority would hold that the Legislature may not grant standing more broadly than Lee. The majority can wait for a future *654 case that has not drawn public attention[5] to openly and directly declare the MEPA citizen-suit standing provision unconstitutional.
The majority’s application of Lee’s judicial standing test to these plaintiffs imposes unprecedented, judge-made restrictions on MEPA plaintiffs’ access to the courts. The majority’s decision overrules without discussion 30 years of precedent, imposes on all future MEPA plaintiffs the burden of establishing standing under the restrictive test of Lee, and undermines the people’s mandate expressed by Const 1963, art 4, § 52 that the Legislature provide for the protection of Michigan’s natural resources. While pretending to limit its “judicial power,” the majority’s application of Lee’s judicial standing test in this case actually expands the power of the judiciary at the expense of the Legislature by undermining the Legislature’s constitutional authority to enact laws that protect natural resources.
The majority’s failure to adhere to MEPA’s “any person” standard will have far-reaching consequences and will affect plaintiffs’ access to courts in more than just the environmental arena. For example, while resolving the case on other grounds, the Court of Appeals in Cuson v Tallmadge Charter Twp, unpublished opin *655 ion per curiam, issued May 15, 2003 (Docket No. 234157), applied Lee to note that the plaintiffs did not have standing under Lee to enjoin future violations of the Open Meetings Act, MCL 15.261 et seq. The panel did not address § 11(1) of that Open Meetings Act, which provides:
If a public body is not complying with this act, the attorney general, prosecuting attorney in which the public body serves, or a person may commence a civil action to compel compliance or to enjoin further noncompliance with this act. [Emphasis added.][6]
Thus, it cannot be denied that this case concerns more than the people’s constitutional mandate that the Legislature protect the environment and the Legislature’s attempt through MEPA’s citizen-suit provision to do so. It also concerns every statutory grant of standing that is broader than Lee’s standing test.[6]
[7]
Consequently, while I concur with the majority’s conclusion that the plaintiffs have standing to bring this action, I dissent from the majority’s imposition of Lee’s judicial standing test in this case. Further, I disagree with the majority’s inappropriate suggestion, in its reliance on inapplicable federal law, that the plaintiffs’ victory may be short-lived. Ante at 630-631 *656 and 631 n 20. On remand, the parties’ burdens of proof are well-established under MEPA.
I would conclude that the Michigan Legislature has the constitutional authority to create a cause of action and to confer standing on any person without this Supreme Court’s interference through judge-made standing tests. I would further conclude that the Legislature did expressly confer standing on “any person” under MCL 324.1701(1). Therefore, I would hold that plaintiffs have standing pursuant to MCL 324.1701(1) of MEPA.
I. FACTS
In this case plaintiffs, the National Wildlife Federation and the Upper Peninsula Environmental Coalition, seek to enjoin defendants, Cleveland Cliffs Iron Company and Empire Iron Mining Partnership, from proceeding under a permit issued in August 2000 by the Department of Environmental Quality. Plaintiffs allege that the expansion of iron ore mining activities proposed under the permit will irreparably harm wetlands and streams.
II. MEPA
The people of Michigan through the 1963 Constitution expressly directed the Legislature to provide for the protection of the environment. The Constitution provides:
The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction. [Const 1963, art 4, § 52.]
*657 As part of its fulfillment of this mandatory constitutional duty, the Legislature enacted the Michigan environmental protection act (MEPA). State Hwy Comm v Vanderkloot, 392 Mich 159, 183; 220 NW2d 416 (1974).[8]
Having determined that “[n]ot every public agency proved to be diligent and dedicated defenders of the environment,” the Legislature through MEPA “has provided a sizable share of the initiative for environmental law enforcement for that segment of society most directly affected — the public.” Ray, supra at 305, and Eyde, supra. As this Court previously noted, this citizen-suit provision of MEPA “signals a dramatic change from the practice where the important task of environmental law enforcement was left to administrative agencies without the opportunity for participation of individuals or groups of citizens.” Ray, supra at 305.
MEPA broadly defines who can sue to protect the environment by providing:
The attorney general or any person[9] may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction. [MCL 324.1701(1) (emphasis added).]
This Court has explained that MEPA creates “an independent cause of action, granting standing to private individuals to maintain actions in circuit court for declaratory and other equitable relief against anyone *658 for the protection of Michigan’s environment.” Eyde, supra at 454. Indeed, this Court has held that this language confers standing on “any person.” Ray, supra 304-305.
III. MICHIGAN’S JUDICIAL STANDING TEST
Without standing, a court will not hear a person’s complaint — the doors to the court are closed. Unlike other substantive rules governing access to the courts, standing rules focus on the person bringing the claim rather than the claim itself.[10] “Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue.” Sierra Club v Morton, 405 US 727, 731-732; 925 S Ct 1361; 31 L Ed 2d 636 (1972).
In Michigan, the judicial test for standing has focused on prudential, as opposed to constitutional, concerns. Lee, supra at 743 (Weaver, J. concurring); Detroit Fire Fighters Ass’n v Detroit, 449 Mich 629, 643; 537 NW2d 436 (1995) (Riley, J. concurring).[11] Prudential concerns are essentially “matters of judicial self-governance . . ..” Warth v Seldin, 422 US 490, 500; 95 S Ct 2197; 45 L Ed 2d 343 (1975). Before Michigan courts will hear a case, they consider whether “a party’s interest in the outcome of the litigation. . . will ensure sincere and vigorous advocacy.” House Speaker v State Admin Bd, *659 441 Mich 547, 554; 495 NW 2d 539 (1993). The courts further consider whether the plaintiff has demonstrated that “the plaintiffs substantial interest will be detrimentally affected in a manner distinct from the citizenry at large.” Id.
In developing prudential standing rules, Michigan courts have often drawn from federal case law discussing prudential standing requirements. Id. at 559. Yet the federal courts are bound not only by judicially imposed prudential considerations, but also by federal constitutional limitations on standing imposed by article III of the federal constitution.[12] Warth, supra at 498. Federal constitutional standing limitations involve “whether the plaintiff has made out a ‘case or controversy’ between himself and the defendant within the meaning of article III of the United States Constitution.” Id. at 498.[13]
The United States Supreme Court has made clear that article Ill-based constraints apply to every person who seeks to invoke federal court jurisdiction. Bennett v Spear, 520 US 154, 162; 117 S Ct 1154; 137 L Ed 2d 281 *660 (1997). However, the United States Supreme Court has also made clear that article Ill-based constraints are distinguishable from federal prudential constraints, because prudential constraints can be “modified or abrogated by Congress .. . .” Id.[14] Before Lujan, supra, the United States Supreme Court described the difference between federal constitutional and federal prudential constraints on standing in Sierra Club, supra at 732:
Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a “personal stake in the outcome of the controversy,” Baker v. Carr, 369 US 186, 204 [82 S Ct 691; 7 L Ed 2d 663 (1962)], as to ensure that “the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.” Flast v Cohen, 392 US 83, 101. Where, however, Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff.
There has never been a federal case applying article Ill’s case or controversy based standing constraints to state courts. As noted by Justice Kennedy writing for *661 the Court in ASARCO, Inc v Kadish, 490 US 605, 617; 109 S Ct 2037; 104 L Ed 2d 696 (1989):
We have recognized often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability ....
Nevertheless, because the majority incorrectly and at length insists that article Ill’s case or controversy constraints do apply to Michigan, it is necessary to review those constraints.
For the purposes of this case, the relevant articulation of the federal article Ill-based standing test is found in Lujan v Defenders of Wildlife, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992).[15] In Lujan, supra at 560, the lead opinion of the United States Supreme Court concluded that the “irreducible constitutional minimum” for standing within the meaning of article Ill’s “case or controversy” limitation is as follows:
First, the plaintiff must have suffered an “injury in fact” —an invasion of a legally protected interest which is (a) concrete and particularized, and (b) “actual or imminent, not ‘conjectural’ or ‘hypothetical.’ ” Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be “fairly .. . trace[able] to the challenged action of the defendant, and not... the result [of] the independent action of some third party not before the court.” Third, it must be “likely,” as opposed to merely “speculative,” that the injury will be “redressed by a favorable decision.” [Citations omitted.]
In Lujan, six United States Supreme Court justices agreed that the plaintiffs had failed to demonstrate a concrete injury resulting from a lack of opportunity to *662 consult regarding the impact of certain federally funded overseas activities on its members’ ability to observe endangered species on unspecified future trips abroad.[16] The Lujan lead opinion, with the qualified support of the concurrence, noted that “[w]e have consistently held that a plaintiff raising only a generally available grievance about government — claiming only harm to his and every citizen’s interest in the proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large — does not state an article III case or controversy.” Id. at 573-574.[17]
Until the decision in Lee, it was well-understood by this Court that article Ill’s “case or controversy” limitation was inapplicable to Michigan courts.[18] Until Lee, *663 no decision of this Court characterized standing in Michigan courts as being a constitutional question. Nonetheless, the Lee majority adopted Lujan’s article Ill-based test, concluding vaguely that Lujan’s test was “fundamental to standing.” Lee, supra at 740. The Lee majority warned that to neglect standing “would imperil the constitutional architecture whereby governmental powers are divided between the three branches of government.” Lee, supra at 735.
Obscuring the fact that Michigan’s Constitution contains no corollary to article III, §2, the Lee majority suggested that Michigan’s standing doctrine developed on a parallel track by way of “additional constitutional underpinning.” Lee, supra at 737 (emphasis added). The “additional constitutional underpinning” referenced by the Lee majority was Const 1963, art 6, § 1, which vests the state judicial power in the courts,[19] and Const 1963, art 3, § 2, which divides the powers of government into three branches.[20] However, the cases addressing these provisions cited by the Lee majority were not standing cases; rather each involved a distinct question regarding the scope of judicial power.[21] In *664 other words, the Lee majority incorrectly equated Michigan case law addressing unrelated issues of “judicial power” with federal case law addressing article Ill’s “case or controversy” constraints on standing.[22]
The Lee majority’s analysis, and its adoption of Lujan’s article Ill-based standing test, laid the groundwork to question the Legislature’s authority to confer standing on plaintiffs who would not survive Lee’s test. I continue to believe that the adoption of the Lujan test for standing by the Lee majority was unnecessary. Lee, supra at 744 (Weaver, J. concurring). Further, the majority’s application of Lee’s standing test to a case involving a constitutionally based, expressly legislated grant of standing demonstrates that the adoption of Lujan is not only unnecessary, it is wrong for Michigan. Michigan’s case law addressing distinguishable issues involving the scope of judicial power before Lee already protected the balance of powers among Michigan’s three branches of government.[23]
It is simply not true that a judge-made standing test based on a federal constitutional provision that has no corollary in Michigan would, as promised by the Lee majority, better preserve Michigan’s “constitutional architecture.” Lee, supra at 735. Certainly, the majority’s distracting diversion into contemplations of federal law *665 does nothing to clarify or justify its abandonment of thirty years of precedent under MEPA. Nevertheless, it is clear that Lee has, and the majority in this case has, constitutionalized Michigan’s judicial standing test. In so doing, the majority usurps the Legislature’s authority to modify or abrogate the judiciary’s prudential standing constraints. It is, thus, the majority’s application of Lee’s article Ill-based test to this and future MEPA cases that will disrupt Michigan’s “constitutional architecture” and the legislatively conferred access to the courts.
IV PRESERVING MICHIGAN’S CONSTITUTIONAL STRUCTURE
Among the reasons why Lee’s article Ill-based standing test or any judge-created standing test should not be applied to MEPA plaintiffs, the most important is that to do so defeats the clear, unambiguous, and readily understandable purpose of art 4, § 52 of the Michigan Constitution.[24] Through art 4, § 52, the people of Michigan directed the Legislature “to provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction.” Art 4, § 52 provides that this mandate serves the people’s express “paramount concern in the interest of the health, safety and general welfare of the people” specifically with respect to “the “conservation and development of the natural resources of the state.” Employing the precise words of art 4, § 52, the Legislature enacted MEPA in fulfillment of art 4, § 52’s mandate.
Since MEPA’s enactment, this Court has held that the Michigan Legislature could confer standing under MEPA to “any person” who alleges that a defendant’s conduct *666 has or is likely to “pollute, impair or destroy the air, water or other natural resources or the public trust therein.” Ray, supra. MEPA plaintiffs have not been required, until now, to overcome any judge-created standing tests to gain access to the courts.[25] It is clear that the Legislature’s explicit grant of standing to “any person” under MEPA was intended to operate free from judge-made standing tests. Expanding the application of Lee, therefore, undermines art 4, § 52 and the Legislature’s policy decisions, by restricting who may bring a MEPA action to court.
Expanding the application of Lee’s standing test, as the majority does in this case, also infringes the Legislature’s power to make laws pursuant to art 4, § 52.[26] The Legislature’s decision to allow “any person” to maintain a cause of action under MEPA is consistent with art 4, § 52’s environmental mandate and is an exercise of legislative discretion that carries a presumption of constitutionality. Johnson v Kramer Bros Freight Lines, Inc, supra at 257. As duly recognized by Justice COOLEY: “no court can compel the Legislature to make or to refrain from making laws, or to meet or adjourn at its command, or to take any action whatsoever, though the *667 duty to take it be made ever so clear by the constitution or the laws.” Sutherland, supra at 326.
Through MEPA, the Legislature has given “the private citizen a sizable share of the initiative for environmental law enforcement.” Eyde, supra at 454. Yet it is strongly implied by the majority that MEPA’s citizen-suit provision unconstitutionally transfers to the judiciary the executive power to ensure that the laws are faithfully executed. This argument is unsupportable and incorrect. MEPA’s citizen-suit provision does not expand the power of the judiciary; it grants the power to the people of this state to pursue MEPA violations. The court’s role in these cases differs in no way from any other controversy that comes before it: the court hears the case, interprets the applicable law, and renders a decision.[27]
Moreover, the Legislature’s decision to permit “any person” to sue under MEPA does not interfere with the enforcement of the law by the executive branch, it simply provides every citizen an opportunity to ensure that the laws that are designed to prevent environmental harm are enforced. In this sense, MEPA’s citizen-suit provision is consistent with the fact that, “ [a]ll political power is inherent in the people. Government is instituted for their equal benefit, security and protection.” Art 1, § 1.
*668 Further, the majority’s application of Lee’s standing test ignores the fact that the three branches of government cannot “operate in all respects independently of the others, and that what are called the checks and balances of government constitute each a restraint upon the rest.” Sutherland, supra at 325. Justice Cooley elaborated:
The Legislature prescribes rules of actions for the courts, and in many particulars may increase or diminish their jurisdiction; it also, in many cases, may prescribe rules for executive action, and impose duties upon, or take powers from the governor; while in turn the governor may veto legislative acts, and the courts may declare them void where they conflict with the constitution, notwithstanding, after having been passed by the Legislature, they have received the governor’s approval. But in each of these cases the action of the department which controls, modifies, or in any manner influences that of another, is had strictly within its own sphere, and for that reason gives no occasion for conflict, controversy or jealousy. The Legislature in prescribing rules for the courts, is acting within its proper province in making laws, while the courts, in declining to enforce an unconstitutional law, are in like manner acting within their proper province, because they are only applying that which is law to the controversies in which they are called upon to give judgment. It is mainly by means of these checks and balances that the officers of the several departments are kept within their jurisdiction, and if they are disregarded in any case, and power is usurped or abused, the remedy is by impeachment, and not by another department of the government attempting to correct the wrong by asserting a superior authority over that which by the constitution is equal. [Id.)
The legislative power includes the power to create new legal rights. And, where the Legislature chooses, it may exercise its discretion to create and define new *669 causes of action.[28] Unlike its federal counterpart, the jurisdiction of the Michigan judiciary is not limited by the case or controversy limitations expressed in article III, § 2 of the United States Constitution nor by the federal court’s ever-evolving interpretation of those limitations.
Without a doubt, the constitutionality of MEPA’s citizen-suit provision remains “teed up” for a future open and direct ruling that Lee’s judicial standing test supercedes the Legislature’s authority to confer standing. The majority’s application of Lee’s standing test to any person’s legislatively conferred and constitutionally based standing under MEPA improperly enlarges the court’s power at the expense of the Legislature’s power, ironically violating the very “constitutional architecture” the majority purported to protect in Lee.[29]
*670 V PLAINTIFFS HAVE STANDING UNDER MCL 324.1701(1)
The circuit court concluded that plaintiffs lack standing to sue under MEPA in light of Lee. To reach this conclusion, that court reviewed affidavits of members of plaintiff organizations and made the following comments from the bench:
They were concerned about this, they were concerned about that, they were concerned that there might not be as many birds around Goose Lake as there used to be. And I’m not going to take the time to go through the affidavits one by one, but I think that anybody who reads them will see how often the words or the phrases “I am concerned” without any stated basis in those affidavits for the reason for being concerned. I am concerned that there will be an impact, I am concerned that there has been a diminishment of the fishery in Goose Lake, and I’m concerned that the mining activities will further diminish the fishery. That’s not enough.
Plaintiffs appealed and the Court of Appeals reversed. The Court of Appeals reviewed the plain language of MEPA and, citing Ray, correctly held that plaintiffs have standing. The Court of Appeals stated that it “declined defendants’ invitation to read an additional requirement of compliance with non-statutory standing prerequisites,” i.e., judge-made standing tests. Unpublished memorandum opinion, issued June 11, 2002 (Docket No. 232706). In a footnote, the Court of Appeals aptly commented that it found no indication in Lee that this Court intended to overrule Ray and noted that the statute at issue in Lee could be distinguished because it did not “contain a provision *671 expressly authorizing any person to maintain an action for violations or omissions of the act.” Slip op at 2.
I agree with the Court of Appeals that plaintiffs have standing under MEPA. Consistent with the people’s mandate in art 4, § 52, the Legislature has determined that actual or threatened pollution, impairment, or destruction of natural resources is an injury that any person may seek to enjoin in circuit court. MCL 324.1701(1). In this case, plaintiffs have alleged that the defendant’s proposed mining will harm natural resources. This is sufficient under MEPA to allow the plaintiffs their day in court. Once in the door, plaintiffs must next establish their prima facie case as required by MCL 324.1703(1).[30]
VI. DECODING THE MAJORITY OPINION
The Legislature’s grant of standing to “any person” in MCL 324.1701(1) is unquestionably broader than Lee’s judge-made standing test. The majority retains its firm belief that Lee’s standing test is grounded in the constitutional separation of powers. By repeatedly asserting that the Legislature may not confer standing more broadly than Lee, the majority has impliedly decided the very constitutional question they accuse this dissent of improperly reaching. It appears that, from the majority’s mistaken perspective, the MEPA’s citizen-suit provision is unconstitutional because the Legislature’s attempt to confer standing on “any person” under MEPA violates the separations of powers.
*672 Moreover, it is the majority who, in Lee, created the constitutional dilemma that must be resolved in this case. As previously discussed, Lee unnecessarily imported the federal constitution’s article III case or controversy constraints on standing into Michigan law. It should also be noted that in Lee, the parties had not raised or briefed the applicability of Lujan or article III of the federal constitution. On its own initiative, the Lee majority raised Lujan’s standing test and transformed standing in Michigan into a constitutional question.
I fundamentally disagree with the majority’s perception of judicial discipline and duty. It is not necessarily evidence of judicial discipline to dodge the ultimate issue in a case, be the issue of constitutional dimension or not. Nor is it disciplined to import into Michigan law federal constitutional constraints that the people — the ratifiers of the Michigan Constitution — have not adopted. Moreover, where the Court specifically requests that an issue be briefed (as this Court did in this case) and the issue is squarely presented, dodging the question destabilizes the law. It is particularly inappropriate where the parties must bear the cost of further unnecessary litigation or where the decision creates confusion for the bench and the bar. In this case, it is a proper exercise of judicial duty and power to answer the constitutional question presented by this Court regarding whether Lee’s judge-made standing test supercedes the Legislature’s authority to confer standing.
Further, while purporting to act with judicial restraint by leaving the constitutionality of MCL 324.1701(1) in doubt, the majority attempts to chart a course for the resolution of issues not even before the Court by suggesting that plaintiffs may not simply rely on the affidavits to prove that standing exists. Ante at 630-631. The majority confuses the issue of standing *673 with a court’s subject-matter jurisdiction. Ante at 630-631. The majority erroneously suggests that the circuit court can reverse this Court’s unanimous decision that plaintiffs have standing. Id. However, this Court’s decision that plaintiffs have standing controls that issue.
The majority then hints that plaintiffs’ affidavits may be insufficient either to survive a motion for summary disposition or to meet the plaintiffs burden of proof. For this, the majority cites an irrelevant and nonbinding United States Supreme Court dissenting opinion in a federal case involving federal law. The plain language of MEPA and this Court’s own MEPA decisions are a far more appropriate guide for the circuit court on remand.
MEPA instructs:
When the plaintiff has made a prima facie showing that the conduct of the defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also show, by way of an affirmative defense, that there is no feasible and prudent alternative to defendant’s conduct and that his or her conduct is consistent with the promotion of the public health, safety, and welfare in light of the state’s paramount concern for the protection of its natural resources from pollution, impairment, or destruction. Except as to the affirmative defense, the principles of burden of proof and weight of the evidence generally applicable in civil actions in the circuit courts apply to actions brought under this part. [MCL 324.1703(1).]
As this Court previously held,
the necessary showing to establish a plaintiffs prima facie case is “not restricted to actual environmental degradation *674 but also encompasses probable damage to the environment as well.” General rules of evidence govern this inquiry, and a plaintiff has established a prima facie case when his case is sufficient to withstand a motion by the defendant that the judge direct a verdict in the defendant’s favor. [Nemeth v Abonmarche Dev, Inc, 457 Mich 16, 25; 576 NW2d 641 (1998) (citations omitted).]
This Court has emphasized that MEPA’s, “very efficacy . . . will turn on how well circuit court judges meet their responsibility for giving vitality and meaning to the act through detailed findings of fact.” Ray, supra at 307-308.
VII. CONCLUSION
The majority decision in this case illustrates how judicial activism can be disguised as judicial restraint.[31] Purporting to be concerned about the separation of powers, the majority, in actuality, uses its judicial power to undermine the Legislature’s proper exercise of its authority to create a cause of action and define who can pursue that action in court. The clear implication of the majority’s constitutional rhetoric combined with its application of Lee’s standing test to these plaintiffs is that the majority will not yield to any grant of standing by the Legislature that is broader than the majority’s own judge-made test. The majority’s decision destabilizes the law and overrules 30 years of precedent. See supra at 652 n 3. The majority decision forces future MEPA plaintiffs to establish that an actual or threatened environmental harm has actually injured or will immi *675 nently injure them concretely, that such injury is traceable to the defendant, or that such injury is redressable as required by the majority opinion in Lee, supra at 739-740, or risk being kicked out of court for lack of standing. Thus, any characterization of the majority’s application of Lee’s judicial standing test as a narrower ground to resolve this case is judicial gymnastics or gamesmanship, not an example of true judicial restraint.
The people through Michigan’s Constitution required the Legislature to pass laws to protect the environment. Art 4, § 52. MEPA and its citizen-suit provision properly implements the constitution’s directive. State Hwy Comm, supra at 184. Lee’s more restrictive judge-made standing test should not be imposed on plaintiffs by the majority in this case. Rather, the “any person” standard clearly expressed by the Legislature through MEPA should be applied. To suggest or hold otherwise violates the separation of powers by allowing the judiciary to supercede the Legislature’s grant of standing to “any person” under MEPA.
I, therefore, concur only in the majority’s result that plaintiffs have standing. I would hold that plaintiffs have standing under MCL 324.1701(1) of the Michigan environmental protection act. I, therefore, dissent from all the majority’s reasoning.

 The majority ignores the constitutional mandate of art 4, § 52 and attempts to distract the reader with a discussion of federal standing and federal judicial power, a discussion that is irrelevant to the important questions of Michigan law presented in this case.

 As previously recognized by this Court, “Michigan’s Environmental Protection Act marks the Legislature’s response to our constitutional commitment to the ‘conservation and development of the natural resources of the state.’ ” Ray v Mason Co Drain Comm’r, 393 Mich 294, 304; 224 NW2d 883 (1975) (quoting Const 1963, art 4, § 52).

 Five years after mepa was enacted, this Court said that MEPA “provides private individuals and other legal entities with standing to maintain actions in the circuit court” to protect natural resources. Ray, supra at 304-305. That MEPA grants standing to “any person” has been unquestioned for over 30 years. See, also, Eyde v State of Michigan, 393 Mich 453, 454; 225 NW2d 1 (1975); West Michigan Environmental Action Council v Natural Resources Comm, 405 Mich 741; 275 NW2d 538 (1979); Kimberly Hills Neighborhood Ass’n v Dion, 114 Mich App 495; 320 NW2d (1982); Trout Unlimited Muskegon White River Chapter v White Cloud, 195 Mich App 343; 489 NW2d 188 (1992); Nemeth v Abonmarche Dev, Inc, 457 Mich 16; 576 NW2d 641 (1998).

 The majority cannot seriously dispute, ante at 628 n 19 and 633-634, that Lee is a “judge-made” standing test. Lee “supplemented” Michigan’s previously prudential standing test with a test derived from federal law interpreting a federal constitutional provision that does not apply to the state. Neither the framers nor the ratifiers of the 1963 Constitution, when considering the power of the Michigan judiciary, would have anticipated supplementing Michigan’s prudential standing doctrine with the constraints imported by Lee from art III of the federal constitution. As defined in 1 Cooley, Constitutional Limitations (8th ed) at 125 n 1:
“Judge-made law”, as the phrase is here employed, is that made by judicial decision which construe away the meanings of statutes, or find meanings in them the legislature never held. The phrase is sometimes used as meaning, simply, the law that becomes established by precedent.
Judges can as easily and with as little restraint find new meanings in constitutions that the ratifiers never intended as they can find new meanings in statutes. This is precisely the effect of the majority’s decision in Lee.

 This case has generated considerable and justifiable concern regarding whether this Court would uphold the Legislature’s grant of standing that authorizes “any person,” MCL 324.1701(1), to sue to protect the environment or whether the Court would declare such legislatively conferred standing unconstitutional by extending the rationale of Lee. Note that the state Attorney General’s office on behalf of the Michigan Department of Environmental Quality, appellee before this Court, argues that the Michigan Legislature may grant standing to persons who do not meet the Lee standing test. Included among the many amicus opposing the extension of Lee is William G. Milliken, the Governor of Michigan who signed MEPA into law. Apparently, the executive branch has not and does not share the majority’s fear of MEPA citizen-suits.

 Also see People v Van Turbbergen, 249 Mich App 354; 642 NW2d 368 (2002), where the prosecution raised Lee to suggest that a criminal defendant did not have standing to challenge his arrest as being without legal authority, and Otsego Co Rural Alliance, Inc v Bagley Twp, unpublished opinion per curiam of the Court of Appeals, issued June 19, 2003 (Docket No. 237277), in which the Court held that the plaintiffs did not have standing under Lee to challenge the defendant’s establishment of a Downtown Development Authority or a referendum by which the voters approved a contract between the defendant and a utilities authority established by the defendant and another township.

 See ante at 641.

 Mepa is cqdified as part 17 of the Natural Resources and Environmental Protection Act, MCL 324.101 et seq.

 The definition of “person” in the Natural Resources and Environmental Protection Act, of which mepa is a part applies throughout the act. MCL 324.301(g) of the act defines “person” as “an individual, partnership, corporation, association, governmental entity, or other legal entity.”

 In Flast v Cohen, 392 US 83, 102; 88 S Ct 1942; 20 L Ed 2d 947 (1968), the Court noted “in ruling on standing, it is both appropriate and necessary to look to the substantive issues... to determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated.”

 No Michigan case decided before Lee held that standing to sue in Michigan courts is a Michigan or federal constitutional question as opposed to a prudential concern. Thus the majority’s allegiance to Lee is not allegiance to “traditional grounds” for standing. See ante at 649.

 The first mention of standing as an article III limitation was in Stark v Wickard, 321 US 288; 64 S Ct 559; 88 L Ed 733 (1944). See Sunstein, What’s standing after Lujan? Of citizens suits, “Injuries,” and Article III, 91 Mich L R 163, 169 (1992). The majority’s assertion that the founding fathers had the specific concept of standing in mind when enumerating the powers of the federal judiciary through article III is pure speculation.

 Art III, § 2 provides in part:
The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their authority;- — to all cases affecting Ambassadors, other public Ministers and Consuls; — to all Cases of admiralty and maritime Jurisdiction; — to Controversies to which the United States shall be a Party; — to Controversies between two or mqre States; — between a State and Citizens of another State; — between Citizens of different States, *660 —between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

 Addressing the legislative standing vis-a-vis federal prudential standing constraints, Justice Scalia writing for the majority in Bennett, supra at 165, held that the grant of standing to “any person” under the Endangered Species Act, 16 USC 1540(g), must be taken at “face value” because “the overall subject matter of this legislation is the environment (a matter in which it is common to think that all persons have an interest) and that the obvious purpose of the provision is to encourage enforcement by so-called ‘private attorneys general’...

 This articulation is relevant because, as will be discussed infra, the majority in Lee “supplemented” Michigan’s standing test with Lujan’s article Ill-based test.

 The Lujan lead opinion was authored by Justice Scalia and joined in whole by Chief Justice Rehnquist and Justices White and Thomas. Justice Kennedy, joined by Justice Souter, concurred separately, agreeing that the respondents failed to demonstrate a concrete injury. Justice Kennedy in his concurrence did not join the part of the opinion that articulated the three-element “irreducible” test, but rather based his concurrence on the respondents’ failure to demonstrate a concrete injury that would he sufficient “under our precedents.” Lujan, supra at 580. The Lujan standing test has been applied, however, in subsequent decisions of the United States Supreme Court. See, e.g., Bennett, supra, and Friends of the Earth, Inc v Laidlaw Environmental Services (TOC), Inc, 528 US 167; 120 S Ct 693; 145 L Ed 2d 610 (2000). Over the dissent of Justices Scalia and Thomas, the United States Supreme Court in Laidlaw tempered its application of the Lujan concrete injury requirement holding that a plaintiffs “reasonable concerns” that a defendant’s conduct would affect their recreational, aesthetic, and economic interest was sufficient. Though Laidlaw preceded this Court’s decision in Lee, it was not mentioned by the Lee majorily. However, it should he noted that the majority now cites with approval the Laidlaw dissent of Justice Scalia. Ante at 631 n 20.

 Justice Kennedy’s concurrence with this portion of the lead opinion was qualified by his view that “Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before.” Lujan, supra at 580.

 ASARCO, Inc, supra at 617, and House Speaker, supra at 559 n 20. See also Lee, supra at 743 (Weaver, J. concurring); Detroit Fire Fighters, supra at 643 (Riley, J. concurring).

 Const 1963, art 6, § 1 provides: “The judicial power of the state is vested exclusively in one court of justice which shall he divided into one supreme court, one court of appeals, one trial court of general jurisdiction known as the circuit court, one probate court, and courts of limited jurisdiction that the legislature may establish by a two-thirds vote of the members elected to and serving in each house.”

 Const 1963, art 3, § 2 provides: “The powers of government are divided into three branches; legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.”

 The Lee majority cited Sutherland v Governor, 29 Mich 320 (1874), which held that the courts cannot issue a mandamus against the Governor; Daniels v People, 6 Mich 381 (1859), which held the authority to set a criminal defendant’s bail was a ministerial, not a judicial act; Risser v Hoyt, 53 Mich 185; 18 NW 611 (1884), which held the Legislature *664 cannot delegate judicial power to circuit judges acting in chambers as opposed to in court; Johnson v Kramer Bros Freight Lines, Inc, 357 Mich 254; 98 NW2d 586 (1959), which held the Legislature may delegate to the judiciary the power to determine whether good cause justified a writ of garnishment.

 Even the author of Lujan’s lead opinion, Justice Scalia, recognized a distinction between article Ill-based standing limitations and the “merely prudential considerations that are part of judicial self-government . ...” Lujan, supra at 560.

 See, e.g., Sutherland, supra; Daniels, supra; Risser, supra; Johnson, supra.

 See, e.g., Michigan Farm Bureau v Secretary of State, 379 Mich 387, 393; 151 NW2d 797 (1967) (addressing principles of constitutional construction).

 Mepa requires plaintiffs to show “that the conduct of defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources ... MCL 324.1703(1). The defendant may rehut a plaintiffs case by submitting evidence to the contrary or by way of an affirmative defense showing “that there is no feasible and prudent alternative to defendant’s conduct and that his or her conduct is consistent with the promotion of the public health, safety, and welfare in light of the state’s paramount concern for the protection of its natural resources from pollution, impairment, or destruction.” Id.

 This present case is distinguishable from Lee because the statute at issue in Lee did not involve a legislated and express cause of action coupled with an unambiguous grant of standing. Lee addressed the plaintiffs standing to compel county boards of commissioners to levy a tax establishing a veteran’s relief fund in accordance with the soldier’s relief act, MCL 35.21 et seq.

 Similarly, the majority is mistaken that art 3, § 8, art 9, § 32, or art 11, § 5 grant “judicial power.” Ante at 624-625. Art 3, § 8 grants power to the Legislature and the Governor to request an advisory opinion on the constitutionality of legislation. Art 9, § 32 grants any taxpayer the ability to pursue violations of the Headlee Amendment, though this majority has recently eviscerated that broad grant of standing by applying broad judicially created principles of res judicata to preclude taxpayer claims. See Adair v Michigan, 470 Mich 105; 680 NW2d 386 (2004) (Weaver, J. dissenting in part and concurring in part). Finally, art 11, § 5 grants power to any citizen to pursue injunctive or mandamus relief for violations of the provisions.

 Art 3, § 7 provides:
The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed.
Interestingly, the majority recognized that this constitutional provision grants the Legislature the power to create a cause of action, limit or modify the cause of action, eliminate a cause of action, or take the less drastic step of hunting the damages recoverable for a particular cause of action. Phillips v Mirac, Inc, 470 Mich 415; 685 NW2d 174 (2004) (opinion of Taylor, J.). Art 3, § 7 is an additional constitutional basis for concluding the Legislature has the authority to define who has standing to pursue a cause of action that it creates and defines. By concluding to the contrary in this case, the majority violates the separation of powers defined in the Michigan Constitution by allowing judge-made standing tests to usurp legislative policy decisions.

 With regard to the balance of governmental powers, it is worth noting that because the current majority would interpret the power of the Michigan court as limited by art III, § 2 of the federal constitution, it has freed itself to impose restrictions on access to Michigan courts *670 beyond those of the Legislature. Moreover, no other branch of government can check or balance the majority’s exercise of its improperly assumed power.

 The realities of a mepa citizen-suit must not be forgotten. Plaintiffs must establish their prima facie case, can receive only declaratory and equitable relief (not money damages), and may be required to bear their own costs. MCL 324.1703 and MCL 324.1701. After more than 30 years, MEPA has not spawned an unmanageable stream of citizen-suits so feared and anticipated by the majority. Ante at 649-650.

 Indeed, the majority has unleashed an assault on mepa this term. In this case, the majority applies Lee’s restrictive standing test to mepa plaintiffs and leaves the future of the more permissive legislatively conferred standing in doubt. By its decision in Preserve the Dunes v Dep’t of Environmental Quality, 471 Mich 508; 684 NW2d 847 (2004), the same majority insulates an illegal sand dune mining permit from scrutiny under MEPA, thereby sanctioning the destruction of critical dunes.